William D. Hyslop
United States Attorney
Eastern District of Washington
Daniel Hugo Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No:  4:18-CR-6054-EFS |
| v. | United States' Sentencing Memorandum |
| SAMI ANWAR, | March 25, 2020 – 10 a.m. |
| Defendant. | |

The United States of America, by and through William D. Hyslop, United States Attorney for the Eastern District of Washington, and Daniel Hugo Fruchter, Tyler H.L. Tornabene, and Brian Donovan, Assistant United States Attorneys, respectfully submits its Sentencing Memorandum with respect to Defendant Sami Anwar.

### INTRODUCTION

After a three-week jury trial in which dozens of witnesses testified and hundreds of exhibits were received in evidence and considered by the jury, the jury unanimously found Defendant Sami Anwar guilty on all 47 charged counts related to Defendant's fraudulently conducting human clinical research trials between 2013

United States' Sentencing Memo -1

and 2018. [1] ECF Nos. 1, 180.  The trial not only conclusively established that Defendant was guilty, beyond a reasonable doubt, of stealing millions of dollars through his falsification of human clinical research trial data, but that he knowingly put hundreds of research subjects and millions of citizens in real danger through his intentional submission of fraudulent and corrupt medical data into a public health system that Americans rely on every day.  Moreover, the trial conclusively established that not only has Defendant never accepted a shred of responsibility for his crimes, he engaged in a multi-year campaign of intimidation, threats, harassment, and obstruction in order to hide them, a campaign which continued even after he learned that he was under investigation.

As further set forth herein, the United States recommends a sentence of: (1) 360 months of incarceration; (2) 3 years of supervised release; (3) restitution in the amount of $1,885,451.50 to the entities and individual, and in the amounts, set forth herein; (4) forfeiture of at least $5,648,786.69 in the amount of a money judgment on behalf of the United States; (5) no additional criminal fine; and (6) special penalty assessments totaling $4,700 ($100 for each count of conviction).

**REVIEW OF PRESENTENCE INVESTIGATION REPORT**

The United States has reviewed the Draft Presentence Investigation Report (PSR) (ECF No. 188) and believes it to be substantially accurate and complete in

---

[1]    Defendant was convicted of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 1349, 23 counts of Wire Fraud, in violation of 18 U.S.C. § 1343;  five counts of Mail Fraud, in violation of 18 U.S.C. § 1341, six counts of Fraudulently Obtaining Controlled Substances, in violation of 21 U.S.C. § 843(a)(3); and one count of Furnishing False or Fraudulent Material Information, in violation of 21 U.S.C. § 843(a)(4)(A).

all major respects.  The United States has provided supplemental information to, and discussed a few minor factual clarifications with, the U.S. Probation Office so that they can be addressed, to the extent necessary, in the final PSR.  The United States also recommends one additional adjustment, discussed herein. The United States does not anticipate any formal objections to the PSR.

### SUMMARY OF OFFENSE CONDUCT

The Court is very familiar with the Defendant's conduct, which is also discussed extensively in the PSR.  Between 2013 and 2018, Defendant and his two companies, Zain Research LLC and Mid Columbia Research LLC, falsified numerous human clinical research trials.  Defendant's fraudulent activity included: (1) admitting ineligible subjects into the studies, frequently by falsifying medical documentation and misrepresenting their medical histories and physical conditions; (2) falsifying progress notes, vital signs, drug dispensing data, and other documents to make it appear as though subjects were legitimately participating in the trials when they were not; (3) falsifying documents to make it appear as though the trials were being performed and supervised by a licensed physician when they were not, and posing as a physician on the phone and in person; (4) hoarding and destroying study medications in order to make it appear that they were being dispensed as required and conceal that subjects were not legitimately participating in the trials; (5) failing to report adverse events and significant adverse events experienced by trial subjects; (6) falsifying laboratory testing by submitting blood and urine samples from site employees, other research subjects, or unrelated medical patients and falsely labeling them as coming from research subjects; and (7) fabricating diary entries required to be completed by study subjects. *See* PSR, ¶¶ 9-75.  Each of these fraudulent practices had the same goals: to bill for as many subjects as possible by making it appear that they were legitimately participating in the study, when they were not, and to hide the fraud from auditors, independent monitors, and

United States' Sentencing Memo -3

regulators.

As the trial demonstrated, while Defendant's crimes involved stealing money from the pharmaceutical and research companies that were funding the studies, the true victims were the hundreds of research subjects and hundreds of millions of Americans who were endangered by the fraudulent and corrupt data submitted through his fraud.  As the trial made clear, clinical research trial data is the foundation for nearly every advancement, medication, treatment, and procedure used in medicine.  Clinical research trial data is relied upon by the U.S. Food and Drug Administration (FDA) to make critical decisions regarding which drugs to approve and for what purposes, and, if so, what side effects and contraindications to warn the public about.  PSR, ¶ 10, 12.  Clinical trial data is also relied upon by physicians and healthcare providers in determining what drugs to prescribe for their patients and what side effects to discuss with them.  For example, the Braeburn Study involved a new experimental medication intended to treat those with pain who were using opioids and were at risk of opioid dependence or addiction.  PSR, ¶ 18.  Defendant's conduct was therefore not only fraud, but an egregious breach of trust against a critical health system that had the potential to endanger hundreds of millions of Americans who rely, directly and indirectly, on clinical study data every day.

Defendant was not content, however, with jeopardizing the lives of millions of Americans through his submission of corrupt and fraudulent data, nor with stealing millions of dollars through his lies.  PSR, ¶¶ 84-104.  As the evidence at trial showed, Defendant waged a campaign of fear, harassment, threats, intimidation, and retaliation, to hide his crimes and to keep his employees from coming forward and blowing the whistle.  *Id.*  His conduct included stalking his employees, filing false police, medical board, and FDA complaints, engaging in frivolous litigation, threatening them and their families with deportation, jail time,

and financial ruin, and slashing their tires, all designed to prevent their cooperation with law enforcement and obstruct the United States' investigation. *Id.* Defendant was so single-minded in his pursuit of the fraud that his campaign continued even after multiple search warrants were executed at his place of business and he was arrested, charged, and detained in November 2018. *Id.* In fact, *after* the initial search warrant was executed at Defendant's businesses in January 2018, Defendant responded by starting yet *another* fraudulent clinical research company with yet *another* proposed puppet doctor, Gopinath Sunil, an attempt that failed when Dr. Sunil refused to participate and Defendant threatened him with physical harm. PSR, ¶¶ 61, 100; Trial Exh. 413, 416.

## I.   BASE OFFENSE LEVEL AND ENHANCEMENTS

The United States Sentencing Guidelines (USSG) are advisory. *United States v. Booker*, 543 U.S. 220, 245-46 (2005). However, "the district courts still must consult [the] Guidelines and take them in to account when sentencing[.]" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (internal citation and quote omitted). "The appropriate guidelines range, though now calculated under an advisory system, remains the critical starting point for the imposition of a sentence under § 3553(a)." *United States v. Mashek*, 406 F.3d 1012, 1016, n.4 (8th Cir. 2005) (quoted approvingly in *Cantrell*, 433 F.3d at 1279).

Base Offense Level and Amount of Loss/Gain

The United States generally agrees with the PSR's calculation that the offenses are appropriately grouped together and that the base offense level is 7. PSR, ¶¶ 108-09; U.S.S.G. § 2B1.1(a)(1). The United States further agrees that this offense level should be increased by 18 levels pursuant to § 2B1.1(b)(1)(J). PSR, ¶ 110. The undisputed evidence at trial demonstrated that the loss/gain just between 2014 and 2017 was at least $5,648,786.69 because none of the trials conducted by Zain Research or Mid Columbia Research were appropriately conducted by, or

under the supervision of, a licensed physician and because all clinical trials performed by the Defendant were fraudulent.  *Id.*; *see also* PSR, ¶¶ 73-76; U.S.S.G. § 2B1.1 Cmt. N. 3(C) (the court "need only make a reasonable estimate of the loss.").  For example, in *United States v. Johnson*, 540 F. App'x 573, the Ninth Circuit affirmed the district court's adoption of the government's loss calculation, holding that "[t]hough this figure was an extrapolation from reasoned assumptions, rather than a precise calculation of the amount of loss, the district court did not err in relying upon it, and noting that "[t]he district court "need only make a reasonable estimate of the loss."  540 F. App'x 573, 576-77 (9th Cir. 2013) (*citing U.S. v. Armstead*, 552 F.3d 769, 778 (9th Cir. 2008)); *see also United States v. Scrivener*, 189 F.3d 944, 950 (9th Cir.1999) (affirming an estimate that extrapolated total loss from a small sample of victims).  Notably, the Cholesterol and Smoking Cessation studies began in 2013, shortly after Zain Research was formed, and continued until 2015, while the Braeburn study took place in 2016 and 2017.  PSR, ¶¶ 31-34, 44, 50.

Moreover, this calculation actually drastically understates even the economic loss caused by Defendant's conduct, because it only includes the money paid by sponsors and monitors to Defendant.  Just as a few examples, it does not include the significant amount of money expended to monitor Defendant's site or to collect the ultimately-worthless data, nor does it include the significant amounts expended to perform the numerous internal audits needed to confirm that the data were unreliable, or the statistical analyses performed to exclude Defendant's corrupted and worthless data from the data relied upon by FDA.  PSR, ¶¶ 22-24, 53-58.

Use of Sophisticated Means

The United States also agrees with the PSR's inclusion of a two-level increase for the Defendant's use of sophisticated means, pursuant to § 2B1.1(b)(10)(C).  *See United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014)

United States' Sentencing Memo -6

1    (upholding "sophisticated means" enhancement where defendant engaged in

2    "dozens of various acts," including falsifying invoices and checks, to conceal

3    payments); *U.S. v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013) (upholding a

4    "sophisticated means" enhancement for using a bank account with a deceptive name

5    to conceal income and stating that conduct need not involve "highly complex

6    schemes or exhibit exceptional brilliance" to warrant the enhancement); *see also*

7    *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam) (affirming

8    application of the "sophisticated means" enhancement where defendant falsified

9    documents and left a "complicated and fabricated" paper trail that made it hard to

10   uncover his fraud).

11           Risk of Death and Serious Bodily Injury

12           The United States further agrees with the PSR's inclusion of a two-level

13   enhancement under U.S.S.G. § 2B1.1(b)(16)(A) because the offense involved a

14   conscious risk of death or serious bodily injury.  As the PSR noted, at least one

15   subject in multiple fraudulent trials conducted by the Defendant passed away during

16   his participation in the trials.  PSR, ¶¶ 67, 70, 112.  Because of Defendant's fraud,

17   this subject was not being evaluated by a physician, nor was his participation or

18   medical condition being appropriately monitored.  *Id.*  Moreover, as the PSR notes,

19   at Defendant's specific instruction, this subject's death was not reported as a

20   significant adverse event, as required.  *Id.*  Other subjects also suffered serious

21   bodily injury as a result of Defendant's fraud.  For example, one of the teenage

22   subjects in the Smoking Cessation Study attempted suicide and was hospitalized.

23   PSR, ¶ 60.  As Margot Johnson, a Pfizer research scientist, testified at trial, suicidal

24   ideation was one of the primary concerns relative to the Smoking Cessation Study

25   that trial sites and physicians were required to monitor.  Not only was this, again at

26   Defendant's specific instruction, not reported as an adverse event, but Defendant

27   directed that this teenage girl remain in the smoking cessation study.  As another

United States' Sentencing Memo -7

example, Daisy Garduno's 3-year old daughter was fraudulently enrolled in a scabies study without Ms. Garduno's knowledge or permission, despite the fact that she did not have scabies, but excema.  PSR, ¶ 65.  As Ms. Garduno testified, the study medication resulted in Ms. Garduno's daughter being permanently scarred and injured.  *Id.*  Moreover, though important, the subjects in the studies were only a small percentage of those whose death or serious injury was risked as a result of Defendant's conduct.  PSR, ¶ 66.  By intentionally injecting fraudulent and corrupt data that was intended to be relied upon by FDA, physicians, and drug companies, Defendant's conduct created the serious risk that members of the public could die or be seriously harmed by medications.  *See, e.g.,* PSR, ¶¶ 10, 12, 23, 66, 209.

Organizing and Leading the Fraud

The United States also agrees with the PSR's inclusion of a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a).  As the PSR sets forth, Defendant was the organizer and leader, personally directing every aspect of the fraud and the falsification of documentation.  PSR, ¶ 28, 115.  As the PSR notes, Defendant's scheme not only involved five or more participants, but dozens, more than a dozen of whom testified at trial under oath and candidly admitted to their participation in the fraud at Defendant's direction.  *Id.* These witnesses, from the receptionist at the front desk, to the study coordinators, to the physicians, unanimously testified that Defendant was the individual that was in charge of and controlling every aspect of the fraud and directing dozens different sets of employees for five years.

Abuse of Position of Trust

The United States also agrees with the PSR's inclusion of a two-level enhancement pursuant to U.S.S.G. § 3B1.3 due to the Defendant's abuse of a position of public or private trust.  PSR, ¶ 114.  The application notes make clear that this applies where a defendant has "professional or managerial discretion".  U.S.S.G. § 3B1.3, Cmnt. N. 1.  Defendant plainly enjoyed that discretion; not only

was he the director of all clinical research, but personally supervised and directed all activities and aspects of the fraud. PSR, ¶¶ 28, 30-34, 38, 56, 62-64, 67-70. Moreover, the application notes specifically state that the enhancement applies where a defendant "perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician," which is precisely one of the things that Defendant did. U.S.S.G. § 3B1.3, Cmnt. N. 3. The notes further clarify that the adjustment "also applies to persons who provide sufficient indicia to the victim that they legitimately hold a position of public or private trust when, in fact, they do not. Such persons generally are viewed as ***more*** culpable." *Id.* at Background (emphasis added). Defendant's fraud not only involved posing as a physician to patients, sponsors, and monitors, but falsely misrepresenting to FDA, study subjects, sponsors, and monitors that the studies were being legitimately conducted and supervised by licensed and qualified physicians. As the PSR sets forth and as the jury trial made clear, clinical research trials rely heavily on trust and the data submitted by individual sites such as that of the Defendant. PSR, ¶¶ 10, 12, 114. Defendant's conduct represented an egregious breach of that trust. As the Sentencing Guidelines make clear, because Defendant's conduct represented a breach of trust and not simply the use of a special skill, this adjustment is applied in addition to the adjustment under U.S.S.G. § 3B1.1(a) due to Defendant's role as the organizer and leader of the fraud.

<u>Obstruction of Justice</u>

The PSR's final adjustment is a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. As set forth in the indictment, as demonstrated during the trial, and as extensively set forth in the PSR, the United States agrees that this enhancement is plainly appropriate given Defendant's concerted campaign of obstruction, threats, retaliation, and harassment. PSR, ¶¶ 84-104. As the application notes make clear, Defendant's obstructive conduct both before and after

United States' Sentencing Memo -9

the start of the investigation are relevant to this adjustment.  U.S.S.G. § 3C.1.1 Cmnt. N. 1.  Defendant engaged in nearly every single one of the list of examples of obstructive conduct provided in the application notes.  Defendant threatened numerous witnesses, including his employees and former employees, to make them continue to participate in the fraud and to not cooperate with law enforcement. PSR, ¶¶ 84-85, 88-90, 92, 94-98, 100, 102-04.  He committed, suborned, and attempted to suborn perjury and false statements to law enforcement and governmental entities in multiple proceedings.  PSR, ¶¶ 84-88, 91-94.  He produced and attempted to produce multiple false documents and statements during law enforcement proceedings. PSR, ¶¶ 84-86, 91-92.  He destroyed or concealed Pfizer study binders that he had testified to the court were in his business location only a week before. PSR, ¶ 99.  He provided false information to numerous judicial officers, and used false and frivolous litigation to further his scheme.  PSR, ¶¶ 88, 93.  All this conduct had the same goals: to intimidate his employees into continuing with the fraud, to frighten them away from reporting him or leaving his scheme, to punish those who did quit or cooperate so that they would be a lesson to others, to discourage them from cooperating with law enforcement, and to prevent his crimes from coming to light by thwarting the United States' investigation.

<u>Using a Minor to Commit a Crime</u>

Under U.S.S.G. § 3B1.4, if the defendant used, or attempted to use, a minor to commit the offense, or to avoid detection of the offense, a two-level adjustment is appropriate.  As the Ninth Circuit has held, this adjustment must be applied whenever "the defendant took affirmative steps to involve a minor in a manner that furthered or was intended to further the commission of the offense," whether or not the minor himself or herself participated in the crime.  *U.S. v. Castro-Hernandez*, 258 F.3d 1057, 1060 (9th Cir. 2001).  Moreover, if a defendant used or attempted to use more than one minor, an upward departure may be warranted.  U.S.S.G.

United States' Sentencing Memo -10

§ 3B1.4, Cmnt. N. 3.  In this case, Defendant's conduct involved the use of dozens of minors in the Smoking Cessation Study, which involved adolescent smokers. PSR, ¶¶ 59, 60; Trial Exh. 144, 152.  As with his other studies, Defendant monetized these adolescents, using them to bill for hundreds of thousands of dollars. PSR, ¶ 81; Trial Exh. 140. As trial testimony revealed, a number of these adolescents experienced serious harm while they were supposed to be in Defendant's care.  For example, one teenage girl in the smoking cessation study attempted suicide while in the study. PSR, ¶ 60.  Defendant not only failed to report this as an adverse event, but prevented the subject from getting proper care from the licensed physician who was supposed to be conducting the study.  *Id.*  When she and her grandmother called from the hospital following her suicide attempt, at Defendant's direction, they spoke to Defendant, not to the licensed physician who was supposedly conducting the study.  *Id.* Similarly, another adolescent's mother attempted to withdraw her consent for her son to participate in the trial because she was concerned that he was using the weekly payments for drugs. Trial Exh. 152.  Again, at Defendant's direction, she spoke not to the licensed physician who was supposedly conducting the study, but to Defendant, who directed that the patient remain in the study.  *Id.* Defendant did this for one reason and one reason alone – so he could continue to monetize and bill for these and other patients.  He not only made them unwitting accomplices in his fraud, but put their health at risk.  The United States respectfully submits that this adjustment should also be applied.

<u>Total Adjusted Offense Level</u>

Per the PSR, the adjusted offense level is 37.  The United States agrees with these calculations, but further submits that an additional the two level enhancement under U.S.S.G. § 3B1.4 for using a minor to commit a crime is appropriate, which would make the total offense level 39.  If the § 3B1.4 enhancement is not applied, the Court can and should take Defendant's use of minors into account under 18

U.S.C. § 3553(a).

## II.    18 U.S.C. § 3553(a)

The applicable sentencing factors under 18 U.S.C. § 3553(a) are: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense, as well as to afford deterrence, protect the public from further crimes of the defendant and provide the defendant training and treatment; (3) the kinds of sentences available; (4) the established Guidelines sentencing ranges; (5) any pertinent Guidelines policy statements; (6) the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes; and (7) the need to provide restitution to victims of the offense. 18 U.S.C. § 3553(a).

In this case, the section 3553(a) factors weigh heavily in favor of a sentence above the applicable guideline range. With regard to the nature and circumstances of the offense, as the PSR notes, while the guidelines calculation largely takes into account Defendant's specific offense characteristics, it does not account for the far-reaching consequences of his conduct, specifically, the ways in which Defendant knowingly and intentionally undermined a vital public health system by submitting corrupt and fraudulent data that he knew that the FDA would be relying upon in determining what drugs to approve, for what purposes, what side effects and contraindications to consider and warn patients and physicians about, and what warnings to require in package inserts and advertisements, as well as by physicians in making prescribing decisions and communicating with patients. PSR, ¶ 209. Nor did Defendant's conduct take place in a vacuum. Taking Defendant at his word that he was a physician in Pakistan, Defendant was in a unique position to know how dangerous his conduct was and how it jeopardized the lives and safety of hundreds of research subjects and hundreds of millions of Americans relying on the outcome

of the trials.  Moreover, as the PSR notes, the 2-level enhancement for the risk of death and substantial bodily harm does not account for the sheer number of individuals that Defendant harmed and placed at risk of harm through the fraudulent data.  PSR, ¶ 209.  Nor does it fully account for the fact that more than one of Defendant's subjects died while taking part in his trials and while ostensibly under his care, that numerous others suffered substantial bodily harm, while hundreds of others risked death or harm, or that most or all of these subjects were participating in the trials believing, based on Defendant's lies and fraud that he was a licensed physician, and that he and other licensed physicians were looking out for their best interests. *See, e.g., U.S. v. Eldick*, 443 F.3d 783, 789-90 (11th Cir. 2006) (where defendant posed as a physician and distributed hydrocodone, upholding above-guidelines consecutive sentence under 18 U.S.C. § 3553(a) on the basis that the guidelines range was "inadequate because it failed to grasp the full significance and breadth of harm inflicted by [defendant's] actions in that there were a large number of victims, some of whom suffered physical and mental trauma . . . including instances where Defendant's actions may have directly or indirectly resulted in a patient's death" and where Defendant profited from billing for these patients.)

Similarly, the other 3553(a) factors weigh in favor of a more stringent sentence.  While the Defendant's formal criminal conviction history is limited, including a 2013 two-year deferral at age 35 for spousal domestic abuse involving his wife and son, a 2016 1-year deferral at age 37 for a hit and run, and a 2017 2-year deferral for theft related to an altercation between Defendant and Dr. Cheta Nand, a former business partner, Defendant's scored criminal history category of I drastically understates his long history of criminal conduct.  PSR, ¶¶ 127-137. Indeed, Defendant committed the instant offense over a five year period between 2013 and 2018 during which he was essentially under continuous probation on these three deferrals, each one requiring that Defendant not commit any further violations

of law.  Moreover, in September 2019, while awaiting trial in this case at the Benton County Jail following a determination from the Court that Defendant represented both a danger to the community and a risk of flight, and under specific Order from this Court both limiting Defendant's phone contact and his contact with employees of his businesses, Defendant had an employee, Janie Cruz, smuggle a phone into the jail and provide it to Defendant.  PSR, ¶¶ 136-37.  Defendant's conduct was not only a felony under Washington State law, but a direct violation of this Court's Order restricting his phone access and his access to employees.  During the time that Defendant possessed this phone, Pfizer study binders that the Defendant told the Court were maintained at his business location suddenly and suspiciously went missing immediately after Defendant told the Court about them.  PSR, ¶¶ 99, 101. Because Defendant cannot appear on this felony charge at this time, it cannot be resolved or scored as part of his criminal history.

Moreover, Defendant has shown a nearly decade-long complete disregard for the law and the safety of the public in favor of his own selfish ends.  Almost immediately after he started his clinical study company, his employees and physicians began expressing concerns to him that his actions were not only fraudulent and illegal, but dangerous.  PSR, ¶¶ 52, 62, 67, 69-70.  Defendant chose to continue his fraud. In 2014, independent monitors for Pfizer and other companies began expressing concerns and taking actions to protect the public.  PSR, ¶¶ 53-57. Defendant chose to continue his fraud. In 2015, Pfizer conducted two for-cause audits that resulted in Pfizer terminating the Defendant's studies and reporting him to the FDA.  PSR, ¶ 58.  Defendant chose to continue his fraud.  In 2016, FDA conducted its own inspection and placed Defendant's company Zain Research and Dr. Cheta Nand on the "warning list," pending corrective action.  PSR, ¶ 59. Defendant chose to continue his fraud.  In fact, not only did not perform any corrective action, Defendant started a new company, Mid Columbia Research, and

United States' Sentencing Memo -14

found a new puppet doctor, Dr. Lucien Megna, and then used their names and clean records to obtain the Braeburn study, using a new group of employees. PSR, ¶¶ 21, 59, 61.  He also attempted to scale up his fraud, starting the company Bracket Trials in Missouri and enlisting the name of Dr. Danish Jabbar to be his puppet doctor there.  PSR, ¶¶ 72, 85.  When Dr. Jabbar expressed concerns and told Defendant he would not continue to participate, Defendant threatened him, and followed through on his threats by making a false complaint to FDA.  PSR, ¶¶ 72, 85. When Defendant's new group of employees at Mid Columbia Research began also expressing the same concerns, Defendant ignored these concerns as well, and retaliated against those who expressed them.  PSR, ¶¶ 88-104.  When one of them was courageous enough to take her concerns to Braeburn, and Braeburn did its own audit and terminated Defendant and reported him again to FDA, Defendant *again* attempted to ignore these findings, starting a new company, GS Trials, and finding a new doctor, Dr. Gopinath Sunil, to *again* replicate the fraud scheme.  PSR, ¶¶ 61,100.  When Dr. Sunil refused to participate in the fraud, Defendant threatened Dr. Sunil with physical harm, claiming, whether falsely or truthfully, that he was connected to underworld figures in Pakistan that he knew that Dr. Sunil was more afraid of than anyone else in the world.  *Id.*  Defendant then continued to threaten, harass, and intimidate his employees and former employees, slashing their tires, filing false complaints, and threatening them with deportation, ruination, and jail time, even after he became aware of the United States' investigation.  PSR, ¶¶ 88-104.

Throughout all of this, over the better part of a decade, Defendant demonstrated a complete lack of respect for the law and a total disregard for the safety and well-being of his employees, patients, research subjects, and the public. Time and again, he consciously put his patients and the public at risk while he pursued his own selfish ends, even in the face of objections and concerns from

United States' Sentencing Memo -15

sponsors, regulators, physicians, and his own employees.  It is very clear that Defendant would still be conducting fraudulent clinical studies if he had not been arrested, detained, and charged, and virtually assured that he would do so again, or perpetrate some other fraudulent scheme, if he were released.  Defendant's contempt for the law, his facility with medical terms and processes, and his disregard for public health and safety make him a very serious danger to the community.  A long term of imprisonment is necessary to protect the public from his further crimes, to promote respect for the law, and to adequately address his egregious conduct.

Another factor under section 3553(a) is the need to avoid unwarranted sentencing disparities between defendants with similar records convicted of similar crimes.  Other sentencing courts have found that above-guideline sentences were appropriate in fraud sentencings that involved solely financial harm and did not involve any of the aggravating factors or public health concerns at issue here, in sentencings after guilty pleas rather than after a contested trial.  For example, in *U.S. v. Hilgers*, the Ninth Circuit upheld a five-year sentence for a wire fraud conviction upon a plea (rather than after trial) in which the guideline range was determined to be 12 to 18 months.  560 F. 3d 944 (9th Cir. 2009).  The court in that case concluded that the above-guideline sentence was appropriate and necessary, to protect the public from further financial crimes of the defendant and to deter his criminal conduct, and in light of his history of repeated conduct and lack of remorse. *Id.* at 946-48; *see also U.S. v. Moschella*, 727 F.3d 888 (9th Cir. 2013) (upholding wire fraud sentence of 63 months imprisonment after plea agreement notwithstanding that guideline range was 33-41 months due to the sophisticated and calculated nature of the scheme, and other 3553(a) factors); *U.S. v. Berghuis*, 741 F. App'x 514, 516 (9th Cir. 2018) (upholding above-guidelines 168 month sentence "in order to protect potential victims from [defendant's] similar conduct in the

future, and in order to make sure that crime doesn't pay for him."); *U.S. v. Erhabor*, 507 Fed. App'x 664 (9th Cir. 2013) (upholding above-guidelines wire fraud sentence after guilty plea based on the duration of the scheme "and the various fraudulent activities undertaken by [defendant] to perpetuate the fraud."); *U.S. v. Ferrell*, 19-CR-0029-RHW, ECF No. 101 (E.D. Wash. 2019) (imposing above-guidelines sentence in wire fraud plea where defendant embezzled from a charitable organization).

### III.    SPECIFIC BASES JUSTIFYING AN UPWARD DEPARTURE/VARIANCE

As discussed above, Defendant's guideline range is not sufficient under the totality of the 3553(a) factors.  Based on Defendant's egregious conduct and the extreme and widespread harm he caused, this Court should impose a sentence above Defendant's guideline range.  *See Gall v. United States*, 552 U.S. 38, 47 (2007) (sentencing a defendant outside the guideline range does not require extraordinary circumstances and is left to the discretion of the sentencing court).  Specifically, for the reasons detailed herein, this Court should impose a sentence of no less than 360 months incarceration followed by supervised release of three years.  The proposed sentence of not less than 360 months is fully supported by application of the 3553(a) factors and necessary in order to address those factors adequately.

<u>Upward Departure/Variance Based on Non-Monetary Harm to Others</u>

Defendant's non-monetary harm to others is not fully accounted for in his guideline range and justifies a substantial variance upwards.  Moreover, there are multiple provisions of the Guidelines providing for upward departures, applicable to Defendant's conduct, based on the non-monetary harm caused to others, whether done intentionally or by creating a known risk, where the harm is not adequately taken into account by the applicable guideline range.  *See generally* U.S.S.G. § 1B1.3 comment. n.6(B) (creation of risk not adequately taken into account by

United States' Sentencing Memo -17

applicable offense guideline may justify an upward departure); U.S.S.G.§ 2B1.1, comment. n.21(A)(ii) (where offense causes or risks substantial non-monetary harm an upward departure may be justified).  Specifically, the comments to § 2B1.1 provide that where an "offense caused or risked substantial non-monetary harm," including causing "physical harm, psychological harm, or severe emotional trauma, or resulted in a substantial invasion of a privacy interest (through, for example, the theft of personal information such as medical, educational, or financial records)" an upward departure may be warranted.  § 2B1.1, comment. n.21(A)(ii).  The Guidelines further delineate the following specific kinds of harm that can justify an upward departure from the Guideline Sentencing Range: offense resulting in death or serious bodily injury (§ 5K2.1); offense resulting in significant physical injury (§ 5K2.2); offense resulting in extreme psychological injury (§ 5K2.3); and extreme conduct engaged in by the defendant (§ 5K2.8).  Based on the uniquely appalling way in which Defendant perpetrated his crimes, the Guideline calculation for his offenses does not take into account the substantial non-monetary harm he caused to so many, both intentionally and through knowingly creating the risk of that very harm.  Although, his guideline range includes a two level enhancement for risk of death or serious bodily harm, under U.S.S.G. § 2B1.1(b)(16)(A), *see* PSR ¶ 112, as the PSR appropriately recognizes, this simply does not adequately address the true gravity of the risk that Defendant posed to so many nor the concrete non-monetary harm he did in fact cause.  PSR, ¶ 209; *see also* U.S.S.G. § 5K2.0(a)(3). Consequently, each of these factors, taken together or separately, necessitate a substantial upward departure/variance from Defendant's guideline range.

    The evidence adduced at trial clearly shows that Defendant caused and knowingly risked the death of others, the significant physical injury of others, and the extreme psychological injury of others.  Put simply, the evidence establishes that Defendant knowingly and intentionally profited from human suffering that he

United States' Sentencing Memo -18

himself caused.  The suffering that Defendant profited from included the knowing risk of harm to the general public (both death and significant physical injury) through the generation of corrupted drug efficacy and drug safety data on dozens of clinical research studies.  *See e.g.* PSR ¶¶ 23, 52, 59, and 76.  The suffering that Defendant profited from also included causing and knowingly risking harm (both death and significant physical injury) to dozens, if not hundreds, of unwitting study subjects who, among other extreme violations of patient safety, did not give informed consent and were falsely led to believe (or in the case of studies with child and adolescent subjects, their parents or guardians were falsely led to believe) that the study was under the supervision of a licensed medical doctor.  *See e.g.* PSR ¶ 60 (14 year-old subject attempting suicide), ¶ 62 (subjects at risk by simultaneously being put on multiple anti-diabetic medications), ¶ 65 (3 year-old subject permanently scarred by study medication), and ¶¶ 69-70 (female subject with month long menstruation and an elderly male subject in multiple studies dying).   The suffering that Defendant profited from also included causing and knowingly risking extreme psychological injury to certain subjects and to over a dozen employees and former employees of his as he repeatedly entangled them in his web of deception, surveillance, harassment, and intimidation all in order to keep the money from his fraud flowing to him.  *See, e.g.,* PSR ¶ 87 (Defendant traps a patient suffering from anxiety and her 2 year-old daughter in an exam room to try and extract a false complaint); ¶ 95 (Defendant goes to former employee's new work, placing her in fear for herself and her family); ¶ 98 (Defendant places a doctor employee of his in such fear that she sleeps with her child and a knife); ¶ 100 (Defendant intimidates another doctor employee by claiming ties to international terrorists); and ¶ 103 (Defendant harasses a suicidal employee at her home).

While the evidence at trial shows that the Defendant did in fact cause substantial non-monetary harm to specific individuals, he also knowingly created

the risk of that harm to hundreds more.  In the context of these upward departures a key term of art is "knowingly risked."  *See* U.S.S.G. §§ 5K2.1, 5K2.2, and 5K2.3. In *United States v. Barnes*, the Ninth Circuit upheld the sentencing court's upward departure under U.S.S.G. § 5K2.0 for the defendant's creation of serious risk of bodily injury where the defendant's offense conduct included fraudulently impersonating a licensed medical doctor.  185 F.3d 869, 1999 WL 459223 (9th Cir. 1999).  The Ninth Circuit explained that "[t]he district court reasonably concluded that Barnes' impersonation of a doctor created a risk of serious bodily injury that was present to a degree substantially in excess of that which ordinarily is involved in a fraud offense."  *Barnes*, 185 F.3d 869 *(internal quotations omitted)*.

Here Defendant, typically while impersonating a licensed medical doctor, not only knowingly and at times intentionally risked harm to others, did in fact cause serious harm to others.  For instance, Defendant did not just knowingly create a risk of death, his offenses did in fact result in the death of at least one subject. Specifically, Billy Birge (former study coordinator) testified at trial about an elderly subject who Defendant enrolled in three clinical research studies contrary to each of those study's protocols and contrary to good clinical practice and basic concepts of safety.  The elderly subject died of kidney failure, which can result when a person is on multiple medications and drugs.  Tellingly, Defendant ensured that the death was not reported to any of the monitors or drug sponsors of the studies in which the subject was enrolled.  *See* PSR ¶ 70.  Further the United States intends to introduce evidence at the sentencing hearing of data found on the backup of Defendant's seized contraband cell phone indicating Defendant's direct knowledge of another subject in one of his fraudulent opioid studies, a 49 year-old male, who died unexpectedly of a heart attack in 2016.

Similarly, Defendant's knowing risk of significant physical injury to others was part and parcel of his crime though not fully accounted for under his guideline

United States' Sentencing Memo -20

range.  *See* U.S.S.G. § 5K2.2.  Under this section "significant physical injury" requires more than "ordinary scratches, scrapes, and bruises," from a "minor scuffle," and instead the physical injury "should be of some importance."  *United States v. Singleton*, 917 F.3d 411, 413-14 (9th Cir. 1990).

The evidence at trial provided ample examples of the clear risk of significant physical injury that Defendant created, and in fact caused, over the course of five years of conducting phony human clinical research studies.  As just one example, Daisy Garduno testified that Defendant fraudulently convinced her husband to, without her knowledge, enroll her 3 year-old daughter in a scabies study, a condition that she did not have, and applying an experimental medication which permanently scarred and injured the child.  *See* PSR ¶ 65.  In addition, Billy Birge testified regarding the adult female subject who reported to him that she was suffering a month long menstruation and was scratching herself until she bled.  Mr. Birge testified that nonetheless Defendant directed that the subject remain in the study.  *See* PSR ¶ 69.  Of course, Defendant ran dozens and dozens of phony clinical research studies involving hundreds of subjects so Ms. Garduno's child and Mr. Birge's subject are merely the tip of the iceberg of the extreme harm Defendant caused that is not fully accounted for in his guideline range.

In addition to the physical harm Defendant caused, his crimes also inflicted extreme psychological injury on multiple individuals.  *See* U.S.S.G. § 5K2.3.  Extreme psychological injury is defined as "substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavioral patterns." § 5K2.3.  Here, Defendant inflicted extreme psychological injury upon multiple individuals, including, for instance, the adolescent subject of the smoking cessation study who was committed to in-patient treatment for suicidal

ideation (a known risk of the experimental medication) who Defendant counseled to continue as a subject in the study. *See* PSR ¶ 60. To be clear, with regard to this adolescent subject, Defendant both knowingly created a risk of serious injury and death, and also inflicted extreme psychological harm especially when he counseled the suicidal teen to remain in the study while fraudulently posing as a doctor.

Defendant also inflicted extreme psychological harm on his employees and former employees in an effort to continue his fraud. Defendant inflicted this harm through, for instance, unwanted visits and home invasions of his employees and former employees such as Katlynn Moulton and Daisy Garduno. In the case of Ms. Moulton, she was contemplating self-harm as a result of Defendant's actions towards her at work and had stayed home just to avoid him, yet he showed up at her home unannounced to berate her for missing work. PSR, ¶ 103. In the case of Ms. Garduno, she had quit working for Defendant and had moved to an undisclosed location to avoid Defendant's intimidation tactics, including home invasion, only to have him once again come to her home and threaten her and her family yet again. PSR, ¶¶ 96-97. In addition, this Court witnessed multiple former employees testify at trial and simply break down in tears as they recounted what Defendant had put them through, even all these years later.

Defendant's crimes also involved a substantial invasion of privacy not accounted for in his Guideline Sentencing Range. U.S.S.G. § 2B1.1, comment. n.21(A)(ii). Defendant's substantial invasion of privacy in the service of the crimes he perpetrated knew few, if any, bounds. Defendant's invasions were not only of his employees (keeping them under video surveillance and monitoring their emails), not only of certain former employees (for instance having them followed in the case of Ms. Garduno or stalking them himself like with Ms. Correa at her new place of work), but his invasions of privacy were also of clinical research subjects and medical patients. For instance, as was testified to at trial, Defendant directed that

United States' Sentencing Memo -22

blood be stolen from other subjects, or patients of his medical center, in order to be fraudulently passed off as the blood of other subjects.  PSR, ¶¶ 30 and 63.

Moreover, nearly all of the above provides examples of Defendant's extreme conduct, which provides an additional basis for an upward departure under U.S.S.G. § 5K2.8.  Under that basis where a defendant's conduct is "unusually heinous, cruel, brutal, or degrading to the victim" an upward departure may be warranted.  U.S.S.G. § 5K2.8.  Examples of such extreme conduct include "prolonging of pain or humiliation."  The victim of the extreme conduct need not be the victim of the offense of conviction.  *United States v. Haggard*, 41 F.3d 1320, 1327 (9th Cir. 1994); *see also United States v. Sherwood*, 98 F.3d 402, 413 (9th Cir. 1996); *compare United State v. Hoyungowa*, 930 F.2d 744, 747 (9th Cir. 1991) (holding that U.S.S.G. § 5K2.3 (extreme psychological injury) did not extend to psychological injury caused to the family members of the victim)).

The Ninth Circuit has held that this basis for upward departure may apply where "the defendant's cruelty or degradation to the victim go beyond that inherently associated with the crime."  *Haggard*, 41 F.3d at 1328.   Here, Defendant's crimes are all based in fraud, which typically contain very little inherent cruelty or degradation to victims, and yet the evidence at trial revealed that the manner in which Defendant directed and perpetrated his crimes was cruel and degrading.   For instance, in addition to the above referenced examples of Defendant's extreme conduct, Justina Bruinekool testified to Defendant requiring her to provide her own blood so often that she would pass out.  PSR ¶ 30. Ms. Bruinekool even testified to the small room where Defendant would require her to provide her blood time and again.  In addition, when Defendant discovered that Ms. Bruinekool was working with law enforcement he convinced her not to quit, keeping her around just long enough to attempt to frame her for theft and illegal possession of drugs.  PSR ¶ 91. Ms. Bruinekool was able to resign but upon

claiming unemployment benefits to which she was entitled, Defendant contested her receipt of benefits and provided false testimony under oath in order to prevent her from getting her benefits that she and her family needed to make ends meet. Unfortunately, Defendant was successful and Ms. Bruinekool was required to pay back over six thousand dollars to the state as a result.  PSR ¶ 93.  Defendant's extreme conduct was not inherent to his offense of defrauding drug sponsors or lying to the DEA, rather he employed this extreme conduct, cruelly degrading specific victims of his crimes like Ms. Bruinekool, to further benefit and protect himself and his fraud scheme.  Consequently, this Court should substantially depart upward from Defendant's guideline range.

<u>Upward Departure/Variance based on Disruption of Governmental Function and Endangering the Public Welfare</u>

Where a defendant's offense significantly disrupts a governmental function or significantly endangers the public welfare, an upward departure or variance is warranted.  *See* U.S.S.G. §§ 5K2.7 and 5K2.14.   The upward departure of significant disruption of a governmental function may apply where the nature of the disruption from the defendant's conduct is not inherent in the offense.  U.S.S.G. § 5K2.0(a)(2); *see also United States v. Valez*, 113 F.3d 1035, 1039 (9th Cir. 1997). Providing fraudulent information, even to a government entity, does not mean that significant governmental disruption is an inherent part of the corresponding offense. *See Valez*, 113 F.3d at 1039.

With regard to an upward departure/variance for endangering the public welfare, it too is reserved for cases where a defendant's conduct provides an exceptional danger to the public welfare over and above any such danger inherent in the offense.  *See, e.g., United States v Semsak*, 336 F.3d 1123 (9th Cir. 2003) (involuntary manslaughter case where sentencing court properly applied § 5K2.14 departing upward based on defendant driving an eighteen wheeler drunk and killing

a person); *United States v. Todd*, 909 F.2d 395 (9th Cir. 1990) (possession of document making implements and possession of stolen mail case where sentencing court properly applied § 5K2.14 departing upward based on defendant's endangering national security by stealing 184 blank military ID cards). That is precisely the case here, where endangering public welfare is not inherent in Defendant's offenses and his conduct has significantly and severely endangered the public.

Defendant's five year-long scheme was premised on injecting corrupted drug efficacy and drug safety data, intentionally camouflaged at Defendant's direction to appear reliable and accurate, into the public health system. This Court heard the testimony at trial of experts with the FDA and from the Washington State University School of Medicine as well as individuals who have dedicated their entire careers, whether working at high levels within the research and development divisions of major drug sponsors or working as monitors and auditors of clinical research studies, to ensuring the scientific reliability of the drug efficacy and drug safety data generated from human clinical research studies. *See generally* PSR ¶ 12. It is impossible to overstate the seriousness of Defendant's crimes; intentionally violating study protocols and good clinical trial practice, all for his own profit at the expense of the public welfare. As was made clear at trial, Defendant corrupted the essential scientific data relied upon by the FDA on dozens and dozens of clinical research studies. Defendant knowingly and intentionally perpetrated his scheme with regard to drugs meant to treat serious illnesses whether the intended population was vulnerable such as the very young, the elderly, or drug addicts. Defendant perpetrated his crimes on studies that were to benefit people suffering from life-threatening conditions as well as everyday conditions. The sheer magnitude of Defendant's corruption of data is so vast that the FDA is still attempting to mitigate its effects. *See* PSR ¶ 10. In fact, there still remain drug sponsors who unwittingly

United States' Sentencing Memo -25

used Defendant's corrupted data to gain approval of drugs from the FDA or gain approval from the FDA to be able to market drugs to expanded populations or for expanded disease states.

At bottom, Defendant could have chosen to perpetrate a fraud scheme in a multitude of ways and in a multitude of different sectors, even within the health care industry. However, Defendant made a conscious decision, every day for years, to intentionally defraud drug sponsors by corrupting essential scientific data that he knew was relied on by the FDA and ultimately millions nationwide including patients, parents, care givers, pharmacists, hospitals, doctors, and a myriad of other health care workers. Defendant's crimes have clearly and significantly endangered the public welfare and significantly disrupted governmental functions, most notably the FDA, none of which is addressed by Defendant's guideline range and all of which makes a substantial upward departure/variance necessary.

<u>Upward Departure/Variance for Defendant's Egregious Obstruction of Justice</u>

The PSR justifiably provides for a two level enhancement for Defendant's obstruction of justice under U.S.S.G. § 3C1.1, PSR, ¶ 116. However, this standard enhancement for obstructive conduct does not fully account for Defendant's egregious and sustained obstruction of justice which victimized and re-victimized numerous people, involved multiple false allegations, and often relied on rank intimidation tactics such as stalking and home invasion. *See, supra*; PSR, ¶¶ 84-104.

Defendant's extreme obstructive conduct necessitates an upward departure or variance. Upward departures are warranted when based on circumstances preset to a degree not adequately taken into consideration the by Guidelines. U.S.S.G. § 5K2.0(a)(3). Specifically, the Guidelines provide that an upward departure may be warranted in "an exceptional case, even though the circumstances that form the

basis for the departure is taken into consideration in determining the guideline range," where the court determines the circumstances to be "substantially in excess of" those ordinarily involved in that kind of offense.  *Id*.  Sentencing courts faced with obstructive conduct substantially in excess of that which is ordinarily taken into consideration under U.S.S.G. § 3C1.1, have had their upward departures/variances upheld.  *See e.g. United States v. Clements,* 73 F.3d 1330, 1341-43 (5th Cir. 1996) (affirming sentence of upward departure, in addition to the § 3C1.1 enhancement, of four additional levels based on a finding of at least four instances of obstruction including false statements and document destruction); *United States v. Furkin*, 119 F.3d 1276, 1283-84 (7th Cir. 1997) (upholding as reasonable a two level upward departure, in addition to the § 3C1.1 enhancement, where conduct included instructing multiple witnesses to lie to the grand jury, directing others to sign back dated documents, hiding assets, and intimidating one witness); *United States v. Wallace*, 417 Fed. Appx. 276 2011WL915671 **1-2 (4th Cir. March 17, 2011) (upholding as reasonable two level upward departure, in addition to the § 3C1.1. enhancement, where defendant threatened to kill a co-defendant and tried to get the co-defendant to take full blame for offense); *compare United States v. Wallace*, 461 F.3d 15, 37-38 (1st Cir. 2006) (inadequate factual record for upward departure, in addition to enhancement under § 3C1.1, based on obstructive conduct where defendant's conduct only included perjury and flight). At bottom, where, as here, there are multiple obstructive acts that differ in kind and have different obstructive objectives (e.g. keeping employees from leaving or cooperating, retaliating against employees, etc.), the conduct is fairly said to fall sufficiently far outside the heartland of conduct thereby justifying an upward departure.  *See United States v. Venture*, 146 F.3d 91, 97 (2nd Cir. 1998).

Defendant's single minded campaign of obstruction was so sustained, far reaching, and uniquely vicious that it defies simple parallels in federal case law.

However, this Court is very familiar with Defendant's obstructive conduct and the number of others individuals it included both as targets of his lies, threats, intimidation, and harassment as well as those who were accomplices to his efforts, whether coerced or willingly submitting to Defendant's criminal direction.  Just focusing on when Defendant became aware of the criminal investigation, his obstructive conduct included, but was by no means limited to: directing at least four different witnesses on at least five different occasions to lie to law enforcement or otherwise not cooperate (*see* PSR, ¶¶ 88, 90, 94, 104); slashing tires of at least two different witnesses on at least six separate occasions (*see* PSR, ¶¶ 88, 97 (additionally, Garduno testified that after Defendant's second unwanted and threatening visit she found her tires slashed)); filing false complaints with regulators and law enforcement, including attempts to frame and lies in unemployment hearings, against at least three witnesses on four separate occasions (*see* PSR, ¶¶ 91, 93 (additionally, Bruinekool testified to Defendant's false allegations to the Washington Department of Health regarding her medical assistant license); and personally intimidating and threatening at least four different witnesses on at least five different occasions (*see* PSR, ¶¶ 95-98, 100).  Defendant's obstructive conduct quite literally terrorized dozens of employees and former employees.  Defendant placed people in such fear that Dr. Sunil testified that as soon as he handed his letter of resignation to Defendant he jumped into a running car and had his wife drive immediately to a police station to seek protection.  Defendant's inspiration of such fear was not accidental, rather it was a constant and unyielding effort to control people through fear in order to continue his criminal activity, keeping his illegal proceeds flowing, and attempting to thwart the efforts of regulators and law enforcement at every turn.  Consequently, a substantial upward departure/variance is needed to adequately address Defendant's extreme obstructive conduct.

United States' Sentencing Memo -28

### IV.    Restitution

Restitution is mandatory for the Defendant's offense conduct. 18 U.S.C. § 3663A(a)(1) and (c)(1)(A)(ii) (the court "shall order" restitution to the victim of any offense "against property under [Title 18] . . . including any offense committed by fraud or deceit"). Mandatory restitution shall be awarded to any victims of the offense conduct, which means "a person directly and proximately harmed as a result of the commission of an offense" or in the case of a conspiracy offense, "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Here, the United States is requesting restitution on behalf of six victims of the offense conduct in the total amount of $1,885,451.50. *See* ECF No. 188, PSR, ¶¶ 81-82.

Compensable Losses

Section 3663A(b)(1)(B)(i)(I) provides that for an offense resulting in loss of property of a victim, the Court shall order restitution equal to the "value of property on the date of the damage, loss, or destruction." The amount of restitution should include the victim's "actual losses that are a direct and proximate result of the defendant's offense." *United States v. Gagarin*, 2020 WL 727761, at *8 (9th Cir. Feb. 13, 2020). As explained in further detail below, most of the restitution sought on behalf of the victims falls within this category of loss and, therefore, is compensable as a matter of law.

In addition, the order of restitution shall "reimburse the victim for lost income …, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Victims Pfizer, Braeburn, and Medpace seek restitution for lost income, transportation, attendance at proceedings, and other expenses incurred during their participation in the investigation and prosecution of offense. The Supreme Court recently limited the application of § 3663A(b)(4) in

United States' Sentencing Memo -29

*Lagos v. United States*, 138 S.Ct. 1684 (2018). It held that that the statutory language does not cover the costs of a private investigation that the victim chooses on its own to conduct, which pre-date or are not incurred during participation in the Government's investigation. *Id.* at 1689-90. However, the Court specifically declined to extend its ruling to bar recovery for expenses incurred by a victim for a private investigation pursued at the Government's behest or in support of an active Government-led investigation. *Id.* at 1690 ("We therefore need not address in this case whether this part of the Mandatory Victims Restitution Act would cover similar [investigation] expenses incurred during a private investigation that was pursued at a government's invitation or request"). As demonstrated in these victims' restitution requests, the restitution requested for "other expenses" is narrowly tailored to include only costs incurred by the victims through its participation in and assistance with the Government's investigation and prosecution of the offense and attendance at proceedings. As such, the requested restitution constitutes a type of loss that is compensable under § 3663A(b)(4) and *Lagos*.

<u>Victims and Restitution Requested</u>

The United States seeks restitution in the total amount of $1,885,451.50 for the six victims listed herein. This restitution request is calculated as follows:

1.    <u>Biorasi:</u> Total restitution requested is $739,984.20. ECF No. 188, PSR ¶ 81. The restitution sought reflects the property loss suffered by Biorasi as a result of funds remitted by Biorasi to Defendants for a scabies medication study which was fraudulently conducted by Defendants. *Id.*; *see also* Biorasi Victim Impact Statement. Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(1)(B)(i)(I).

2.    <u>Pfizer:</u> Total restitution requested is $646,955.17. PSR ¶ 81. Of the total amount, Pfizer requests restitution in the amount of $640,427 paid by Pfizer to Zain Research, which reflects the property loss suffered by Pfizer as a result of

funds remitted by Pfizer to Defendants for fraudulently conducted studies. *See* Pfizer Victim Impact Statement. Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(1)(B)(i)(I).

In addition, Pfizer seeks restitution in the amount of $6,528.17 in expenses incurred by a Pfizer employee during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. *See* Pfizer Victim Impact Statement. Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(4) and *Lagos*.

3.    Braeburn: Total restitution requested is $435,732.93. PSR ¶ 81. Of the total amount, Braeburn requests restitution in the amount of $373,644.12, which reflect the property loss suffered by Braeburn as a result of the Defendants' fraudulently conducted studies. *See* Braeburn Victim Impact Statement. The property loss suffered by Braeburn is comprise of three categories of loss: (1) direct payments made by Braeburn to Defendants for the fraudulent studies in the amount of $274,642.80; (2) clinical monitoring costs incurred by Braeburn to monitor the fraudulent studies in the amount of $68,306.55; and (3) the cost of the clinical trial materials supplied by Braeburn to Defendants, which Defendants improperly used, damaged, or destroyed, in the amount of $30,694.77. *Id.* All of these losses constitutes property damage incurred by Braeburn as a proximate result of the offense conduct. Accordingly, restitution for these property losses is mandatory and compensable pursuant to § 3663A(b)(1)(B)(i)(I).

In addition, Braeburn seeks restitution in the amount of $62,088.82 in expenses incurred by Braeburn during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. *See* Braeburn Victim Impact Statement. Braeburn incurred $51,704.20 in expenses during its participation in the investigation and prosecution of the offense. *Id.* Braeburn further incurred $10,384.62 in expenses for two employees to attend trial.

United States' Sentencing Memo -31

*Id.* Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(4) and *Lagos*.

4.    Medpace: Total restitution requested is $46,988. PSR ¶ 81.   This restitution request reflects lost income, travel expenses, and other expenses incurred by Medpace during participation in the investigation or prosecution of the offense or attendance at proceedings. Id.; see also Medpace Victim Impact Statement.  Four employees of Medpace attended trial and considerable expenses were incurred by Medpace at the behest of the United States in order to assist in the trial.   Id. Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(4) and *Lagos*.

5.    Finch Therapeutics:    Total restitution requested is $9,331.20. PSR ¶ 81.   This restitution requests reflects the property losses suffered by Finch Therapeutics as a result of funds remitted by Finch Therapeutics to Defendants for fraudulent studies.  *Id.*; *see also* Finch Therapeutics Victim Impact Statement. Restitution for this loss is mandatory and compensable pursuant to § 3663A(b)(1)(B)(i)(I).

6.    J. Bruinekool: Total restitution requested is $6,460. PSR ¶ 82. Ms. Bruinekool is a former employee of Defendants who participated in the conspiracy for a period of time.  PSR, ¶¶ 28-32. Ms. Bruinekool ultimately left the conspiracy and reported its fraud to Braeburn, Medpace, and the United States and provided substantial cooperation with the United States' investigation, including the search warrant, without seeking or receiving any benefit in return.  *Id.*  Defendant learned that Ms. Bruinekool was cooperating with law enforcement and falsely framed her for theft.  PSR, ¶¶ 89-91.   Defendant then made false statements, and had his employees make false statements, in order to deprive Ms. Bruinekool of unemployment benefits that she had been awarded.  *Id.*  As a result of Defendant's lies Ms. Bruinekool was ordered to pay unemployment benefits back to the

1    Washington Employment Securities Department (ESD).  PSR, ¶ 82, 89-91, 93.

2    Defendant Anwar fraudulent statements at the unemployment hearing were made

3    to cover up and continue the criminal conspiracy for which he was found guilty. *Id.*

4    Ultimately, Ms. Bruinekool repaid $6,460 to Washington ESD, which constitutes

5    loss of property caused by the offense conduct.  *Id.* Accordingly, restitution for this

6    loss is mandatory and compensable pursuant to § 3663A(b)(1)(B)(i)(I).

7    <u>Defendant's Inability To Pay Is Immaterial To The Restitution Award</u>

8    The Defendant's ability, or inability, to pay the restitution award is

9    immaterial to the Court's determination of the restitution owed to the victims.

10    "In each order of restitution, the court <u>shall order restitution to each victim in the</u>

11    <u>full amount of each victim's losses as determined by the court and without</u>

12    <u>consideration of the economic circumstances of the defendant</u>." 18 U.S.C.

13    3664(f)(1)(A) (emphasis added). Thus, in cases where restitution is statutorily

14    mandated, such as the instant matter, the Court must order restitution without

15    regard to the Defendant's financial condition. *See, e.g., United States v. Dubose*,

16    146 F.3d 1141, 1143 (9th Cir. 1998) ("[the MVRA] makes restitution mandatory,

17    without regard to a defendant's economic situation"); *United States v.*

18    *Matsumaru*, 244 F.3d 1092, 1108 (9th Cir. 2001) ("if the defendant is subject to

19    the Mandatory Victims Restitution Act ('MVRA'), the district court need not

20    assess the defendant's ability to pay restitution"); *In re Morning Star Packing Co.,*

21    *LP*, 711 F.3d 1142, 1144 (9th Cir. 2013) ("district court committed legal error in

22    denying restitution because of [defendant's] claimed financial status and the

23    potential availability of civil remedies").

24    Defendant's ability to pay is only relevant to the Court's determination of

25    whether the restitution should be paid immediately in a lump sum, or paid in

26    installments over a period of time. 18 U.S.C. § 3664(f)(2); *United States v.*

27    *Curran*, 460 F. App'x 722, 724–25 (9th Cir. 2011) ("Although the court could not

United States' Sentencing Memo -33

consider Curran's financial condition in imposing restitution, it must do so when fashioning a payment schedule for it").

## V.    FORFEITURE MONEY JUDGMENT

The Defendants have stipulated and agreed to the forfeiture of $175,160.27 funds from KeyBank Account ending in 4371, seized on or about November 8, 2018, pursuant to the execution of a Federal Seizure Warrant. ECF No. 194. In addition to the forfeiture of specific assets, the United States seeks a forfeiture money judgment against Defendant Anwar in the amount of $5,648,786.69, which represents the amount of proceeds obtained by the Defendant from the wire fraud and mail fraud violations.[2]

Courts have repeatedly acknowledged that forfeiture is mandatory and shall be imposed as punishment for a crime. *See United States v. Monsanto*, 491 U.S. 600, 606–07, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (holding that, by using the phrase "shall order" in a criminal forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013) (recognizing that "[f]orfeiture is imposed as punishment for a crime").

---

[2] In cases such as this where a money judgment is sought *and* there are directly forfeitable assets, the proper method of calculation is to enter a money judgment for the full amount of the criminal proceeds, which is later offset by the realized value of the directly forfeitable assets after they are liquidated. *See United States v. Teves,* 621 Fed. App'x 486 (9th Cir. 2015) (the personal money judgment should be entered in the full amount of the loss and later offset by directly forfeitable assets upon liquidation). As such, the Government requests that the Court enter a forfeiture money judgment in the amount of $5,648,786.69 and that the forfeited funds shall be credited against the money judgment.

United States' Sentencing Memo -34

1  "When the government has met the requirements for criminal forfeiture, the district

2  court must impose criminal forfeiture, subject only to statutory and constitutional

3  limits." *United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011).

4        Rule 32.2(b)(1)(A) establishes that the Government is entitled to a personal

5  money judgment against the Defendant. *See Newman*, 659 F.3d at 1240 (Fed. R.

6  Crim. P. 32.2 "makes clear that, at least where the proceeds of the criminal activity

7  are money, the government may seek a money judgment as a form of criminal

8  forfeiture."). Entry of a forfeiture money judgment is mandatory. *United States v.*

9  *Phillips,* 704 F.3d 754, 769-70 (9th Cir. 2012); *Newman,* 659 F.3d at 1240 ("Unlike

10 a fine, which the district court retains discretion to reduce or eliminate, the district

11 court has no discretion to reduce or eliminate mandatory criminal forfeiture); *United*

12 *States v. Casey,* 444 F.3d 1071, 1077 (9th Cir. 2006) (a money judgment is

13 warranted in a criminal case against a convicted defendant even if the defendant is

14 insolvent). Courts have unanimously agreed that *in personam* money judgments are

15 proper even where forfeiture statutes do not refer to money judgments. *Id.* at 1242

16 (citing *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010) (collecting

17 cases)).

18        Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Court shall

19 order forfeiture of any property obtained by Defendant Anwar which constitutes or

20 is derived from proceeds traceable to his offense conduct. *See generally Honeycutt*

21 *v. United States,* 137 S. Ct. 1626, 198 L. Ed. 2d 73 (2017) (a defendant's forfeiture

22 money judgment liability based on the amount the defendant "obtained" through

23 his offense conduct).

24        The correct calculation of the amount of proceeds forfeitable from Defendant

25 Anwar is the gross proceeds he illegally obtained from his offense conduct. 18

26 U.S.C. § 981(a)(2)(A) ("'proceeds' means property of any kind obtained directly or

27 indirectly, as the result of the commission of the offense giving rise to forfeiture,

and any property traceable thereto, and is not limited to the net gain or profit realized from the offense"). Forfeiture under 18 U.S.C. § 981(a)(1)(C) is <u>not</u> limited to net profits that ultimately came to rest in the Defendants' pockets. 18 U.S.C. § 981(a)(2)(A); *United States v. Ford*, 296 F.Supp.3d 1251, 1257-58 (D. Or. 2017) (A forfeiture money judgment is properly calculated as the amount of gross proceeds the defendant obtained from his crimes of conviction established by a preponderance of the evidence and "*Honeycutt* does not require that Defendant still be in possession of his ill-gotten proceeds, it merely limits forfeiture to proceeds that he obtained at some point from his crimes"); *United States v. Lindell*, 2016 WL 4707976, at *12 (D. Haw. Sept. 8, 2016).

The evidence established at trial demonstrates that the total amount of fraud proceeds from the fraudulently conducted trials between 2014 and 2017 is at least $5,648,786.69. See Trial Exhibit 422; *see also* PSR, ¶¶ 73-74, 76, 110. Accordingly, Government is entitled to a forfeiture money judgment against Defendant Anwar in the amount of $5,648,786.69, representing the proceeds of the crimes for which the Defendant was convicted.

Finally, the forfeiture money judgment is not limited to, and need not match, the amount of restitution awarded. *See Newman,* at 1240-41 (Forfeiture money judgments and restitution are independent and distinct remedies; but both are required by statute and imposing forfeiture and restitution "is not an impermissible double recovery").

## VI. SUPERVISED RELEASE

The United States recommends a 3-year term of supervised release following the period of incarceration ordered by the Court.  The United States recommends the Court impose each of the conditions set forth in the PSR.  PSR, pp. 39-42.

//

//

United States' Sentencing Memo -36

## VII. SPECIAL PENALTY ASSESSMENT

A special penalty assessment of $100 is required for each of the 47 counts on which Defendant was convicted.  18 U.S.C. § 3013(a)(2)(A).

DATED: March 6, 2020

William D. Hyslop
United States Attorney

*/s/ Dan Fruchter*
Daniel Hugo Fruchter
Tyler H.L. Tornabene
Brian Donovan
Assistant United States Attorneys

United States' Sentencing Memo -37

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that on March 6, 2020, I electronically filed the foregoing

4    with the Clerk of the Court using the CM/ECF system.

5

6                    */s/ Dan Fruchter*

7                    Dan Fruchter
     Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

United States' Sentencing Memo -38