Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Tyler H.L. Tornabene
Daniel Hugo Fruchter
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>SAMI ANWAR,<br><br>            Defendant. | 4:18-CR-6054-EFS<br><br>United States' Response to Defendant's Emergency Motion for Compassionate Release (COVID-19) |

Plaintiff, United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Tyler H.L. Tornabene and Daniel Hugo Fruchter, Assistant United States Attorneys for the Eastern District of Washington, submits the following response to Defendant's Emergency Motion for Compassionate Release (COVID-19) and request that this Court deny Defendant's motion.

## I.    INTRODUCTION

Defendant, Sami Anwar, asks this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) due to risks associated with the COVID-19 pandemic. Defendant has exhausted the required administrative procedure with the Bureau of Prisons ("BOP") to bring the instant motion. However, for the reasons set forth below, Defendant fails to show any extraordinary and compelling reasons

United States' Response to Defendant's Motion for Compassionate Release- 1

justifying any reduction or alteration of his sentence and the 18 U.S.C. § 3553(a) factors, in particular the egregious nature and circumstances of his offenses as well as his own history and characteristics, all support denying Defendant's motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Clinical research trial data is the cornerstone for medical advancements, treatments, and procedures. The U.S. Food and Drug Administration (FDA) relies on this research to determine medication approvals, and to inform the public about medication purposes and side effects. This information impacts the heath of millions of Americans, and any corruption of that data jeopardizes the validity of properly conducted FDA clinical trials.

Between 2013 and 2018, Defendant and his two companies, Zain Research LLC and Mid-Columbia Research LLC, falsified numerous human clinical research trials with goals to bill for as many subjects as possible by pretending to operate a well-functioning trial study and to obstruct any enforcement body. ECF No. 200. During this five (5) year period, Defendant's fraudulent activity included: (1) admitting ineligible subjects into the studies, frequently by falsifying medical documentation and misrepresenting their medical histories and physical conditions; (2) falsifying progress notes, vital signs, drug dispensing data, and other documents to make it appear as though subjects were legitimately participating in the trials when they were not; (3) falsifying documents to make it appear as though the trials were being performed and supervised by a licensed physician when they were not, and posing as a physician on the phone and in person; (4) hoarding and destroying study medications in order to make it appear that they were being dispensed as required and conceal that subjects were not legitimately participating in the trials; (5) failing to report adverse events and significant adverse events experienced by trial subjects; (6) falsifying laboratory testing by submitting blood and urine samples from site employees, other research subjects, or unrelated medical patients and falsely labeling them as coming

from research subjects; and (7) fabricating diary entries required to be completed by study subjects. *Id* at 3.

In these actions, Defendant tainted and corrupted the integrity of the clinical health system for monetary gain. From 2014-2017, Defendant generated at least $5,648,79.78 in ill-gotten revenue from his fraudulent scheme, which equated to the corresponding calculable loss he caused. *Id.* at 5-6. While this amount represents the money paid by clinical trial sponsors and monitors, there are multiple uncalculated economic losses including the expenses of collecting the data, the damage to the studies themselves, and the impact on the FDA's drug approval process, which is not accounted for in the millions of dollars Defendant reaped from the fraud. *Id.* at 200; ECF No. 198 at 10, 12, 114.

Worse yet, in a years-long campaign to cover up his fraudulent acts, Defendant harassed, threatened, and intimidated dozens of his employees. ECF No. 200 at 10. For example, to deter his employees from exposing his illegal actions, Defendant stalked his them, filed false reports to the police and relevant medical boards, created a false FDA complain, launched frivolous and retaliatory litigation, slashed employees' tires, and threatened his employees and their families with deportation, jail time, and financial ruin. ECF No. 188 at ¶¶ 84-89. Moreover, Defendant routinely put the clinical trial subjects in very real danger. For instance, at least one subject in multiple fraudulent trials conducted by Defendant passed away during his participation in the trials. ECF No. 200 at 7-8. Because of Defendant's fraud, this subject was not being evaluated by a physician, nor was his participation or medical condition being appropriately monitored. *Id.* Moreover, at Defendant's specific instruction, this subject's death was not reported as a significant adverse event, as required. *Id.* Other subjects also suffered serious bodily injury as a result of Defendant's fraud. For example, one of the teenage subjects in the Smoking Cessation Study attempted suicide and was hospitalized. *Id*. Additionally, another

victim's three-year old child was falsely enrolled in a study without parental supervision and subsequently is permanently scarred and injured. *Id*. at 8.

Even during the investigation, Defendant threated witnesses, employees, and former employees, to prevent them from cooperating with law enforcement. ECF No. 188 ¶¶ 88-98. Defendant's employees feared him and his threats. For instance, one of Defendant's employees was so afraid of Defendant's threats that she created an emergency plan for her family, increased her home's lightening, and slept in her child's bed armed with a knife for a period time. *Id*. at 98. Another employee reported Defendant showed him a picture of himself with gang members and Defendant threatened to use his connections against the employee. *Id.* at 100. He also would appear at employees houses unannounced. *Id.* ¶¶ 103, 104. Similarly, he would threaten their physical wellbeing as well as their professional reputation and or work status. *Id.*

In addition, Defendant continued to obstruct justice even after his arrest and incarceration. In September of 2019, Defendant smuggled a phone into the Benton County Jail and appears to have used it to direct the destruction of evidence. ECF No. 200 at 14. He also provided false information to judicial officers, to law enforcement and to government agencies. *Id.* In all Defendant's egregious activities to his employees and to the public, there is one consistent thread: Defendant chose to monetize, for his selfish gain, the suffering and danger he inflicted upon his clinical trial subjects, his employees, and the public at large.

On November 22, 2019, a jury found Defendant guilty on all 47 counts of the indictment which include Conspiracy to Commit Wire Fraud, Conspiracy to Commit Mail Fraud, Wire Fraud, Mail Fraud, Fraudulently Obtaining Controlled Substances, and Furnishing False of Fraudulent Material Information. On October 6, 2 2020 Defendant was sentences to 340 months of imprisonment. ECF No. 241.

### III.    EXHAUSTION

United States' Response to Defendant's Motion for Compassionate Release- 4

To proceed in district court on a compassionate release claim, a defendant must follow the proper procedure. Here, the exhaustion of administrative remedies is a mandatory claim-processing rule.[1] Claim-processing rules are those that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019). Such rules "may be 'mandatory' in the sense that a court must enforce the rule if a party properly raises it," but a litigant can forfeit reliance on the rule by not timely raising it. *Id.* at 1849 (internal quotation marks and brackets omitted). Here, Defendant submitted an administrative request for compassionate release to the Warden of his facility on December 17, 2021. The Warden of his facility did not respond, and because 30 days has passes since the request, the Warden's silence is considered a constructive denial. Despite being unvaccinated, Defendant raised the issue of his risk for serious illness from COVID-19 because he is 43 years of age and is suffering from thyroid cancer, Types 2 Diabetes, headaches, the occurrence of one panic attack, and his anxiety. ECF No. 289 at 8, 10. He thus requests his imprisonment be suspended and his sentence be reduced to time served so he may begin a 3-year term of supervised release on home confinement conditions. *Id.* at 8, 9.

## IV. BOP RESPONSE TO THE PANDEMIC

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control

---

[1] The Department of Justice asserted in similar litigation that this was a jurisdictional rule; however, it has modified its position in light of the Supreme Court's decision in *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) and its progeny. *See e.g. United States v. Franco*, --- F.3d ----, 2020 WL 5249369, at *1-*2 (5th Cir. Sept. 3, 2020); *United States v. Alam*, 960 F.3d 831, 833-836 (6th Cir. 2020).

United States' Response to Defendant's Motion for Compassionate Release- 5

(CDC) and the World Health Organization. Those efforts continue. The United States recognizes that the COVID-19 case rate at a particular institution may change at any time. The United States therefore focuses primarily on considerations specific to the Defendant. However, BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the instant motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected, and some may succumb, just as in the population at large. However, BOP

United States' Response to Defendant's Motion for Compassionate Release- 6

continues to take aggressive and appropriate steps to prevent COVID-19 infections among those in its care

//

## V. LEGAL FRAMEWORK

Motions for compassionate release are governed by 18 U.S.C. § 3582(c)(1)(A). In its original form, that statute permitted the courts to consider motions by the Director of the Bureau of Prisons to reduce a defendant's sentence for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A) (effective November 2, 2002). The statute did not define "extraordinary and compelling reasons" but required any reduction to be consistent with applicable policy statements issued by the United States Sentencing Commission. *Id*. Those policy statements are set forth at USSG §1B1.13 and include commentary that does define "extraordinary and compelling reasons" through a list of conditions. USSG §1B1.13, comment. (n.1). That list is non-exclusive because it includes a catch-all category for "extraordinary and compelling reasons other than, or in combination with," the reasons specifically enumerated. USSG §1B1.13, comment. (n.1(D)). The policy statement also includes a general condition that a defendant not be "a danger to the safety of any person or to the community." USSG §1B1.13(2). The statute incorporated the policy statement by requiring any reductions to be consistent with it. The statute also required district courts to consider the sentencing factors set forth in 18 U.S.C. § 3553 "to the extent that they were applicable." 18 U.S.C. § 3582(c)(1)(A).

In 2018, the statute was amended to permit motions brought directly by inmates. 18 U.S.C. § 3582(c)(1)(A) (enacted December 26, 2018). The amended statute continued to require motions to be considered in light of the sentencing factors set forth in 18 U.S.C. § 3553(a) and "applicable policy statements issued by the Sentencing Commission." *Id*. However, since the policy statement was not similarly amended, it continues to reference only those motions brought by "the Director of the

United States' Response to Defendant's Motion for Compassionate Release- 7

Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A)," not those brought directly by inmates. USSG §1B1.13.

Recently, the Ninth Circuit joined several other Circuits in holding that pursuant to the First Step Act's amendment to 18 U.S.C. § 3582, the previously otherwise applicable USSG policy statements defining "extraordinary and compelling reasons" are no longer binding upon the district court in consideration of compassionate release requests filed by a defendant. *See United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021). However, the Guidelines policy statement remains instructive and relevant in this analysis:

> The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding.

*Id*. at 802. *See also United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020). Indeed, in *Gunn* the Seventh Circuit instructed that the policy statement provided district courts with a useful guide for its analysis and a tool for avoiding error:

> Like the Second Circuit, we do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy. . . . The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. *In this way the Commission's analysis can guide discretion without being conclusive*.

*Id*. at 1180 (emphasis added).[2]

---

[2] The Fifth Circuit recently came to a similar conclusion, noting that although USSG §1B1.13 is not "dispositive" it still "informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release." *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021).

United States' Response to Defendant's Motion for Compassionate Release- 8

In their limited capacity as guide, the application notes to USSG §1B1.13 provide that "extraordinary and compelling reasons" exist when the defendant is suffering from a terminal illness, the defendant is suffering from a serious physical or medical condition, serious functional or cognitive impairment, or experiencing deteriorating physical or mental health that substantially diminishes the ability of the defendant to provide self-care within the environment of the correctional facility and from which he or she is not expected to recover. *See* USSG §1B1.13 comment. (n.1).

A defendant bears the burden to demonstrate she is eligible for such a sentencing reduction. *See, e.g., United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998) ("in a typical motion under 18 U.S.C. § 3582(c)," the movant bears the burden to show eligibility for a reduction in sentence); *see also United States v. Shabudin*, 445 F. Supp. 3d 212, 214 (N.D. Cal. 2020); *United States v. Koval*, 2020 WL 4476554, at *3 (E.D. Cal. Aug. 4, 2020) (citing additional examples). Otherwise, the overriding principle in the criminal justice system is that judgements are final. *See, e.g., Teague v. Lane*, 489 U.S. 288, 309 (1989). Claims of rehabilitation as the sole basis for a reduction of a defendant's sentence are expressly and statutorily excluded. 28 U.S.C. § 994(t) ("Rehabilitation along shall not be considered an extraordinary and compelling reason" in considering a sentencing reduction under 18 U.S.C. § 3582(a)).

## VI. DISCUSSION

A. <u>Defendant Has Not Identified "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction or Release.</u>

Defendant first asserts that he is at high risk for serious complication or death should he be infected with COVID-19. ECF No. 289 at 8, 9. Defendant states he has a history of "papillary thyroid cancer, type 2 diabetes, a history of one documented panic attack and anxiety disorder, and reoccurring headaches." ECF No. 289 at 10. However, a closer look at the Defendant's medical history and BOP records illustrates

a different story which does not represent an "extraordinary and compelling reason" for early release.

//

//

   1. *Defendant's medical conditions do not constitute an extraordinary and compelling reason for sentencing reduction or release.*

Defendant claims his health conditions put him at risk for severe illness or death from COVID-19. These health conditions consist of thyroid cancer, his diabetes, his "history" of panic and anxiety disorder, and concurrent headaches.

   a. *Defendant's Thyroid Condition*

While the Defendant proclaims that he has incredible concern for his health and risk to COVID-19, he has taken no precautions himself to ensure his safety and therefore has no basis for compassionate release. The CDC outlines various ways to combat COVID-19, three important examples include: (1) taking preventive actions, such as washing your hands and not touching your nose and mouth, (2) wearing a mask and social distancing, and (3) obtaining a COVID-19 vaccination. *See* "How to Protect Yourself and Others", CDC, updated Feb. 25, 2022, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html . Washing hands and not touching one's face is done at an individual's own accord. In relation to masks, as outlined above, the BOP has implemented a number of procedures to allow everyday preventative actions. According to the BOP, Defendant's correctional facility, Sheridan, Federal Correctional Institute, is at a Level Two (2) rating.[3] *See* "BOP: Covid -19 Update, https://www.bop.gov/coronavirus/. Meaning, face coverings are required at all times: indoors and outdoors, when social distancing is not possible by both inmates and correctional officers. *Id.* Due to their

---

[3] Defendant incorrectly labels Sheridan, FCI as Level 1.  ECF No. 289 at 25.

United States' Response to Defendant's Motion for Compassionate Release- 10

level two status, FCI Sheridan has limited capacities both indoors and outdoors to limit exposure and ensure the safety of its inmates and staff. *Id.*

Despite Defendant's reliance on CDC guidelines, Defendant has declined to take the suggested measures available to protect himself from COVID-19 infection and prevent serious illness or complications. Simply put, the best option to combat COVID-19 is to get vaccinated. *See* "COVID-19 Vaccines in People with Cancer", American Cancer Society, last revised March 30, 2022, https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/low-blood-counts/infections/covid-19-vaccines-in-people-with-cancer.html; *see* "COVID-19 Vaccines Work", CDC, last updates Dec. 23, 2021. Defendant claims he "refused to be vaccinated because information at the time did not affirmatively indicate the vaccine was safe for cancer patients", however both the CDC and the American Cancer Society have recommended that cancer patients should receive a vaccine. ECF No. 289 at 29; *see* "COVID-19 Vaccines in People with Cancer". American Cancer Society, last revised March 30, 2022, https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/low-blood-counts/infections/covid-19-vaccines-in-people-with-cancer.html; *see* "COVID-19 Vaccines Work", CDC, last updates Dec. 23, 2021. The CDC and the American Cancer society have long urged cancer patients and other immunocompromised individuals to obtain a COVID-19 vaccination. *Id.* In fact, the National Cancer Institute recommended those with cancer receive COVID-19 vaccinations as early as 2020. *See* "Covid-19 Vaccines and People with Cancer: Q&A with Dr. Steven Pergam", National Cancer Institute, last updated March 2020, https://www.cancer.gov/about-cancer/coronavirus/covid-19-vaccines-people-with-cancer. Defendant was offered the COVID-19 vaccine, and additional information on the vaccine given his health status, on February 24, 2021, and he refused to get

United States' Response to Defendant's Motion for Compassionate Release- 11

vaccinated. Exhibit A.[4] Contrary to the Defendant's assertions, there is no documentation in Defendant's BOP medical files illustrating any additional interest in receiving a COVID-19 vaccine. *See* ECF No. 289 at 21.

In addition, papillary thyroid cancer is the thyroid cancer with the best prognosis and can be cured if treated early and appropriately. "Papillary Thyroid Cancer", Columbia Thyroid Center, https://columbiasurgery.org/conditions-and-treatments/papillary-thyroid-cancer. Based on Defendant's medical records, it is clear that Defendant's cancer condition has been monitored and he has been prescribed medication. Moreover, Defendant was offered the opportunity to conduct an oncology surgery to avoid the risk of his cancer spreading, yet he refused. Exhibit A.

Additionally, Defendant's diagnosis of thyroid cancer does not serve as a basis for compassionate release. By way of contrast, one district court found that a defendant with terminal stage III lung cancer (with a 25% survival rate), in conjunction with chronic obstructive pulmonary disease, and medical records suggesting that BOP delayed in diagnosing and treating that defendant for over a year, all combined with COVID-19 pandemic (well prior to a vaccine being available) supported compassionate release. *United States v. Smith*, 464 F. Supp. 3d 1009, 1019 (N.D. Iowa 2020). However, in a case where a defendant was a thyroid cancer survivor with additional health risks during the pandemic, the court denied his motion for compassionate release, reasoning in part that the defendant was able to receive proper medication. *United States v. Figueroa*, 850 F. App'x 818, 819 (3d Cir. 2021). Here, Defendant's condition is not terminal, he has and is obtaining all necessary medical care, and Defendant has acted careless with his illnesses and overall health

---

[4] Based on the timing of obtaining Defendant's medical records from BOP, the United States will file "Exhibit A" underseal with the Court tomorrow. The United States has provided a courtesy copy of Exhibit A via email to the Court and to counsel for Defendant.

United States' Response to Defendant's Motion for Compassionate Release- 12

including refusing the widely available and effective COVID-19 vaccine. Consequently, this Court should find that Defendant's medical conditions in no way constitute an extraordinary and compelling reason for sentence reduction or release.

      b.     *Defendant's Additional Medical Concerns*

Furthermore, Defendant argues that his additional "health conditions" raise concern, putting him at risk for obtaining COVID-19. These additional concerns include type II diabetes, anxiety attacks, and headaches. However, Defendant has consistently received his diabetes medication regularly by BOP medical providers, which help to monitor and control it. Exhibit A. Similarly, Defendant claims he suffers from anxiety and panic attacks. However, in his BOP records, only one panic attack was reported and, when health professionals offered him medication (specifically Ativan) to help address this anxiety, he refused.  Exhibit A. In relation to Defendant's chronic headaches, his medical records detail that he has reported that ibuprofen helped relive his pain. In addition, the BOP went so far as to order a CT to ensure Defendant's neurological health. *Id*. The CT was normal. *Id*.

Despite all Defendant's professed fears of the impact that COVID-19 would have on him (while not availing himself of the vaccine), Defendant tested positive for COVID-19 on September 16th but had mild symptoms. Defendant states that he was "throwing up blood every day. He had blood clots in his arms and legs", which Defendant concedes is not in any documentation within the BOP. ECF 289 at 29; Exhibit A. Rather, BOP documentation shows that Defendant "reports coughing up small specks of blood". Exhibit A. At bottom, Defendant's medical records show he contracted COVID-19 but recovered fully after suffering mild symptoms and being given medication and support from the BOP staff. *Id*.

Nonetheless, Defendant argues that BOP employees are careless, for instance by not noting that he has an allergy to penicillin. In his motion, Defendant states that "the fact that he is allergic to penicillin" is not mentioned in his BOP medical history.ECF 289 at 29. In fact, Defendant's allergy to penicillin is mentioned multiple

United States' Response to Defendant's Motion for Compassionate Release- 13

times, including but not limited to: February 28th, April 11th, October 3rd, 21st and 24th, and December 16th. Exhibit A. Similarly, Defendant argues the BOP failed to test him regularly for COVID-19. *See* ECF No. 289 at 29. However, Defendant's medical records illustrate he was tested for COVID-19 on multiple occasions including October 21, 2020, November 4th, 2020, December 2-8, 2020, and so on. Exhibit A.

Overall, Defendant's medical conditions and concerns regarding his treatment come nowhere near an extraordinary and compelling reason that would justify any sentence reduction whatsoever let alone release.

B. <u>The Sentencing Factors Set forth in 18 U.S.C. § 3553(a) Weigh Against Release and he is a threat to the community.</u>

In addition to evaluating any "extraordinary and compelling reasons," the Court must also evaluate the 18 U.S.C. § 3553(a) factors to determine whether compassionate release is appropriate. Included in this analysis is an examination of the nature and circumstances of the offense as well as a defendant's own history and characteristics, of which this Court is quite familiar. 18 U.S.C. § 3553(a)(1). Even if this Court finds that Defendant's medical conditions somehow demonstrate extraordinary and compelling reasons for release, the Defendant's heinous conduct for which he was convicted by a jury and for which he was sentence, should preclude any reduction in his sentence or early release.

The common nucleus of Defendant's crimes was the monetization of the human suffering he knowingly and intentionally, directly and indirectly, caused for his own personal financial gain. The record shows that Defendant pursued his horrendous objectives with monomaniacal focus and without regard to what person or government agency stood in his way. He repeatedly provided false and corrupted data for human clinical trials on dozens of life saving drugs, these trials of course are the basis of the FDA's evaluation of efficacy and safety for the public. As such, Defendant's fraud impacted all Americans: those who needed and relied on these particular drugs and

United States' Response to Defendant's Motion for Compassionate Release- 14

those who were effectively seeking treatment through the impacted clinical trials, as well as the trust of all Americans in clinical research trials and the faith in the FDA that the public relies upon, especially during a global pandemic.

However, Defendant did not stop there. Throughout the investigation, Defendant obstructed justice and the investigation by failing to follow court orders. He smuggled in a phone into his correctional facility in September 2018 in an apparent effort to destroy evidence, which was seemingly successful. ECF 188 ¶ 101. Further, Defendant routinely threated his employees into submission through an aggressive campaign dedicated to hiding his fraudulent actions. His tactics included filling fictitious police and medical reports, launching frivolous and retaliatory litigation, threatening deportation, and threatening and ensuring financial ruin. By way of further example, Defendant appeared at a former employee's new place of business and questioned her about potential cooperators against him causing her abject fear. ECF No. 188 ¶ 95. Defendant barged into another employee's apartment and threatened her in front of her 10-year-old son. ECF No. 188 ¶ 95. He showed photos of a high-ranking international terrorist in order to intimidate a specific employee. ECF No. 188 ¶ 100 Defendant threatened another employee that should she resign from her job, she would never be able to work in the medical field again and that he would report her the relevant state licensing board. He later had her arrested for theft based on false information that he orchestrated, fortunately the police found no crime had been committed by his intended victim. ECF No 188 ¶ 84 In addition, Defendant sent letters to member of the medical community to not hire a former employee (and known cooperating informant) stating she was terminated for sexually harassing employees. Defendant did all this and more through a variety of highly focused and diabolic means.  Releasing Defendant even one day before his originally imposed sentence, let alone decades,  , would open the flood gates to future intimidating tactics by Defendant and unleash an absolute living nightmare for the former employees and

United States' Response to Defendant's Motion for Compassionate Release- 15

witnesses Defendant has already victimized and intimidated as well as those he was stopped from terrorizing by virtue of his incarceration.

Despite this overwhelming evidence, Defendant contends that he should be released under home confinement. However it is abundantly clear that home confinement will not stop Defendant from terrorizing his past employees and the witnesses against him.

Similarly, home confinement will not stop Defendant from committing further fraud. As this Court is well aware from the record, Defendant established two companies to carry out his fraudulent crimes. Once one was uncovered, he created a new one and continued his fraudulent activity. Prior to his scheme unraveling, Defendant was preparing to repeat this cycle of fraud and obstruction. Home confinement would provide Defendant a golden opportunity to perpetrate further acts of fraud.

## CONCLUSION

Based on the foregoing, the United States respectfully submits that Defendant has not met his burden of establishing an extraordinary and compelling reason justifying a sentence reduction or early release and, in any event, the heinous nature of Defendant's crimes and the threat he would continue to pose to specific individuals and the public at large should preclude any modification of his sentence  This Court should therefore deny Defendant's Motion to Reduce Sentence.

RESPECTFULLY SUBMITTED this 4th day of May, 2022

Vanessa R. Waldref
United States Attorney

*s/ Tyler H.L Tornabene*
Tyler H.L. Tornabene
Assistant U.S. Attorney

United States' Response to Defendant's Motion for Compassionate Release- 16

|   |   |
|---|---|
| 1 | United States Attorney's Office |
| 2 | Eastern District of Washington |
| 3 | 920 West Riverside Avenue, Suite 340 |
|   | Spokane WA 99201 |
|   | Tel 509-835-6320 |

United States' Response to Defendant's Motion for Compassionate Release- 17

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the counsel of record, Alan Ellis and Jeffrey K. Finer.

*s/Tyler Tornabene*
Tyler H.L. Tornabene
Assistant United States Attorney

United States' Response to Defendant's Motion for Compassionate Release- 18